UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Jeronique D. Cunningham, | : | Case No. 3:06 CV 167 |
| | : | |
| Petitioner, | : | |
| | : | **JUDGE PATRICIA A. GAUGHAN** |
| vs. | : | |
| | : | |
| Tim Shoop, Warden, | : | <u>**MEMORANDUM OF OPINION**</u> |
| | : | <u>**AND ORDER**</u> |
| Respondent. | : | |

### INTRODUCTION

This Court denied Petitioner Jeronique Cunningham's petition for writ of habeas corpus on December 7, 2010. (Doc. 157.) On appeal of that judgment, the Sixth Circuit Court of Appeals concluded that one of Cunningham's claims, juror bias, was unexhausted and it remanded the case to this Court "to determine whether it is appropriate to stay-and-abey the petition while Cunningham returns to state court to exhaust this claim." *Cunningham v. Hudson*, 756 F.3d 477, 479 (6th Cir. 2014) (per curiam). This Court then stayed this case and held it in abeyance while Cunningham exhausted the juror-bias claim in state courts. (Doc. 173.) Cunningham has now exhausted the claim and filed an amended habeas petition. (Doc. 200.) Respondent Warden Tim Shoop has filed a

supplemental return of writ (Doc. 201), and Cunningham has filed a traverse.  (Doc. 205.)

For the following reasons, the Court **DENIES** Cunningham's amended petition.

## FACTUAL BACKGROUND

Cunningham was convicted and sentenced to death in an Ohio court (Allen County Court of Common Pleas) for the aggravated murder of three-year-old Jala Grant and seventeen-year-old Leneshia Williams.  *See State v. Cunningham*, 105 Ohio St. 3d 197, 197-200 (Ohio 2004).[1]

In the early afternoon of January 3, 2002, Cunningham and his half-brother, Cleveland Jackson, bought crack cocaine from Lashane Liles at Liles' apartment in Lima, Ohio.  *Id*. at 197.  Cunningham and Jackson returned to Liles' apartment that evening, intending to rob him.  *Id*.  When the brothers arrived, Liles was not home, but several family members and friends were there.  *Id*.

Liles showed up soon after, and Jackson spoke to him about purchasing drugs while Cunningham watched a movie with two teenagers in the living room.  *Id*.  Cunningham then ordered the two teenagers into the kitchen, where three adults and two children – three-year-old Jala and seventeen-year-old Leneshia –  were already gathered.  *Id*.  The teenagers did not immediately comply, so Cunningham pulled out a gun and struck one in

---

[1] The facts and procedural history of this case are more fully set forth in *State v. Cunningham*, 105 Ohio St. 3d 197 (Ohio 2004), and this Court's Memorandum of Opinion and Order, dated December 7, 2010 (Doc. 157).

the face with the gun barrel, breaking his jaw. *Id.* At that point, Jackson brandished his gun and aimed it at Liles. *Id.*

The two teenagers ran into the kitchen, followed by Cunningham, who then held the group at gunpoint. *Id.* at 197-98. Jackson forced Liles upstairs, where he robbed him of drugs and money. *Id.* at 198. Jackson then led Liles downstairs to the kitchen. *Id.* The group was ordered to place their money, jewelry, and watches on the table. *Id.* Jackson demanded more money from Liles, and when Liles told him he had none, Jackson shot him in the back. *Id.* Cunningham and Jackson then turned their weapons on the others, shooting each of them. *Id.* Jala and Leneshia both died from gunshot wounds to the head. *Id.* The rest survived, though all but one were seriously injured. *Id.*

The police recovered only five bullets and eight spent shell casings at the scene and one bullet from a victim's arm. *Id.* at 199. The guns were never found. *Id.* There was no physical evidence that any of the bullets came from Cunningham's gun. *Id.* at 199-200.

## RELEVANT PROCEDURAL HISTORY

### A.      State-Court Proceedings

Cunningham was indicted on two counts of aggravated murder for purposely causing the death of Jayla Grant and Lenishia Williams during an aggravated robbery; one count of aggravated robbery; and six counts of attempted murder. (Doc. 192-1 at 34-44.)[2]

---

[2]All references to page numbers of documents in the Court's electronic court filing system ("ECF") are to the page numbers of the individual ECF documents, not to the original documents' page numbers or ECF "PageID" numbers.

Each of the aggravated murder counts contained two death-penalty specifications:  one

that the murder was part of a course of conduct to kill or attempt to kill two or more

persons, and another that the murder occurred during an aggravated robbery and was

committed with prior calculation and design.  (*Id*. at 34-35.)  Firearm and

repeat-violent-offender specifications were attached to all counts except the weapon-under-

disability charge.  (*Id*. at 34-44.)[3]  Cunningham entered pleas of not guilty to all charges.

(*See* Doc. 192-2 at 204.)

On June 18, 2002, after a seven-day trial, a jury found Cunningham guilty of all

charges, the two death-penalty specifications, and the firearm specifications.  (*See id*. at

204-10.)  After a penalty hearing, the trial court sentenced Cunningham to death on the

aggravated murder charges consistent with the jury's recommendation.  (*Id*. at 211-25.)[4]

Cunningham's convictions and sentences were affirmed on direct appeal.  *See*

*Cunningham*, 105 Ohio St. 3d at 224.

Cunningham filed a timely petition for post-conviction relief in the trial court in

August 2003.  (Doc. 192-4 at 45-453 (Post-Conviction Petition).)  Among other claims, he

asserted that one of the jurors was biased, violating his constitutional right to a fair and

impartial jury.  (*Id.* at 83-86.)  He argued that Nichole Mikesell, the foreperson of the jury,

_____

[3] Cunningham also was charged with having a weapon under disability, but that charge
was severed from the case and then dismissed after his convictions on the other counts.  (*See*
Doc. 192-2 at 154, 232.)

[4] Jackson, who was tried after Cunningham, also was convicted and sentenced to death.
*See State v. Jackson*, 107 Ohio St. 3d 53 (Ohio 2005).

had obtained negative information about him from colleagues at the social-services agency where she worked at the time of the trial. (*Id.* at 85.) To support this claim, he attached a summary of an interview with Mikesell that an investigator for Cleveland Jackson had conducted after the trial. (*Id.* at 310-11 (Ex. R to Post-Conviction Petition).) The investigator reported that Mikesell called Cunningham "an evil person" with "no redeeming qualities." (*Id.* at 311.) He also wrote that she told him that "some social workers worked with Jeronique in the past and were afraid of him," and that "if you observe one of the veins starting to bulge in his head, watch out and stay away because he might try to kill you." (*Id.*)

The trial court denied Cunningham's post-conviction petition without allowing discovery or an evidentiary hearing. (Doc. 192-5 at 8-30.) The state appellate court affirmed. *State v. Cunningham*, No. 1–04–19, 2004 WL 2496525 (Ohio Ct. App. Nov. 8, 2004). The Ohio Supreme Court denied discretionary review. *State v. Cunningham*, 105 Ohio St. 3d 1464 (2005).

### B.      Initial Federal Habeas Proceedings

In October 2006, Cunningham filed a petition for a writ of habeas corpus in this Court, asserting fourteen claims for relief. (Doc. 19.) The case originally was assigned to Judge Peter Economus who referred the matter to Magistrate Judge McHargh for "limited delegation." His first claim included his allegations of juror bias based on Mikesell's knowledge of extra-judicial information about Cunningham. (Doc. 19-2 at 1-6.)

In April 2008, Cunningham requested discovery, including documents and depositions related to his juror-bias claim.  (Doc. 79 at 2-3.)  In June 2008, Judge Economus granted Cunningham leave to depose Mikesell, the other seated and alternate jurors, Mikesell's co-workers at the Allen County Children's Services, and Jackson's investigator.  (Doc. 86 at 12.)  In August 2008, Cunningham requested, and was granted, funds to employ an investigator.  (Docs. 91, 92.)

In the fall of 2008, Cunningham acquired affidavits from two jurors, Staci Freeman and Roberta Wobler.  (Doc. 104-1 (Freeman Aff.); Doc. 103-1 (Wobler Aff.).)  Neither Freeman nor Wobler recalled hearing Mikesell discuss the negative information about Cunningham at issue in Cunningham's petition.  (*See* Doc. 104-1 at 2.)  But, both women averred that Mikesell mentioned knowing the families of the victims of the crime.  (*Id.*; Doc. 103-1 at 1.)  Freeman stated:

> At one point during the jury deliberations, I had problems with the apparent fact that all the ballistic evidence pointed to a 9mm automatic pistol and not the revolver [allegedly belonging to Cunningham]. I expressed my opinion and Nichole Mikesell responded that, You don't understand. I know the families of the people that were shot in the kitchen. The families know me and I am going to have to go back and see them. These families are my clients. I interpreted Mikesell's comments as pressure to vote guilty.

(Doc. 104–1 at 1-2.)  Wobler averred that Mikesell

> stated that she knew of the families of the victims from Family Services[.] One young woman  on the jury was adamant that Jeronique was not guilty. Mikesell told the young woman and the jury that the young woman did not have to work in the local community.

(Doc. 103–1 at 1–2.)

6

Cunningham's counsel deposed Mikesell in January 2009. (Doc. 188-1 (Mikesell Dep.).) She testified that she did not speak to social workers about Cunningham at the time of the trial, but that she did look at his file after the trial concluded. (*Id*. at 118.) During the deposition, counsel asked Mikesell if she knew any of the victims. (*Id*. at 119.) Respondent's counsel objected on the ground that the question was beyond the scope of the claim, and the federal magistrate judge presiding over the deposition sustained the objection. (*Id*. at 120.)

In March 2009, Cunningham moved for, and Judge Economus granted, leave to amend his juror-bias claim to add the allegations that Mikesell was biased because she knew the victims' families, considered them her clients, and would ultimately have to face them in the community. (Docs. 111, 120.) Cunningham also requested an evidentiary hearing, which Judge Economus denied, although he permitted Cunningham to depose jurors Freeman and Wobler on this issue. (Doc. 120 at 5–6.)

Freeman and Wobler were deposed in October 2009. Freeman testified that during guilt-phase deliberations, Mikesell "stat[ed] that she dealt with the victims and their families, they knew who she was, and that if she would find him not guilty that she would have to deal with them and that's just something she didn't want to have to deal with because they knew who she was." (Doc. 137-1 (Freeman Dep.) at 60.) When asked how this remark impacted her deliberations, Freeman testified that she "felt pressured," and "as the last one holding out, [she] felt that [she] was up against a wall, and [Mikesell] was very

domineering and so I just . . . You know I regret, I shouldn't have, but I voted guilty." (*Id.* at 11.) Mikesell's comment, she said, "should never have been made . . . ." (*Id.*) Wobler testified at her deposition that, "at the very end of the deliberations [Mikesell] stated she may in the future be working with the families under the Welfare Job and Family Services where she worked," but "not that she had been." (Doc. 136–1 (Wobler Dep.) at 5–6.) She denied, however, that the comment had any impact on her deliberations (*Id.* at 6) or that anyone forced her to recommend the death penalty (*Id.* at 13).

Cunningham requested and was granted leave to amend his petition in November 2009 and again in March 2010 to include the allegations about Mikesell that he uncovered in the depositions. (Docs. 129, 141.) In March 2010, Respondent moved to strike the Freeman and Wobler depositions on the ground that Cunningham did not diligently seek information about the victims' families in state court. (Doc. 142.) Judge Economus denied the motion (Doc. 155), finding that Cunningham had exercised due diligence in state courts in attempting to develop the claim's factual basis through requests for discovery and an evidentiary hearing, though the state trial court denied those requests. (*Id.* at 3.)

The case was then assigned to this Court which, in December 2010, denied Cunningham's petition. (Doc. 157.) Regarding the juror-bias claim based on Mikesell's relationship with the victims' families, the Court concluded that the claim was unexhausted and procedurally defaulted because Cunningham had not presented it to the state courts, but that even "[i]f the Court were to consider the testimony, it would find this claim to be

without merit." (*Id*. at 31-32.) It found that the deposition testimony of jurors Wobler and Freeman demonstrated that "they were not forced to convict Cunningham. Even though Freeman stated that she felt pressured, it was because she was the only one holding out, and she was not happy that Mikesell, as jury foreperson, was controlling the situation. Usually, a foreperson controls the jury." (*Id*. at 32.)

Cunningham appealed that judgment, and the Sixth Circuit granted a certificate of appealability on seven claims, including whether the presence of the jury foreperson deprived Cunningham of a fair trial. *See Cunningham v. Hudson*, 756 F.3d 477, 481 (6th Cir. 2014). In June 2014, the circuit court issued a per curiam opinion addressing Cunningham's claim of juror bias based on Mikesell's relationship with the families of the murder victims. The court concluded that this claim was unexhausted but not procedurally defaulted, because Cunningham still could raise it in a motion for a new trial or a second petition for post-conviction relief in the Ohio state courts. *Id.* at 485. The court further found that Cunningham had good cause for his failure to exhaust the claim because he did not become aware of the factual basis for this claim until he conducted discovery in this Court, and Respondent had not demonstrated that this Court's finding that Cunningham exercised due diligence in attempting to develop the factual basis of this claim was clearly erroneous. *Id.* at 486. Finally, it determined that the juror-bias claim was "not plainly meritless," as "evidence of [Mikesell's] alleged relationship with the families of the victims raises grave concerns about her impartiality . . . ." *Id*. at 486-87. The court framed the issue

9

raised by this claim as: "did Mikesell have a relationship with the families of the victims, and if so, was she improperly biased or influenced by that relationship and her knowledge that she would have to face them and work in the community after the trial was over?" *Id.* at 486. The court, therefore, vacated this Court's judgment denying Cunningham's petition and remanded the petition to this Court "to determine whether it is appropriate to stay-and-abey the petition while Cunningham returns to state court to exhaust this claim." *Id.* at 479.

The parties then briefed the matter (Docs. 169, 171, 172), and this Court granted Cunningham's request to stay this matter and hold it in abeyance until he exhausted his claim in state courts (Doc. 173). In evaluating Cunningham's request to stay these proceedings under federal law and procedural rules, the Court observed that "Cunningham [had] not engaged in abusive litigation tactics or intentional delay[,]" but had "diligently sought to develop the factual basis of this claim in both state and federal court." (Doc. 173 at 6.)

### C. State-Court Proceedings Following Remand

In December 2014, Cunningham filed in the state trial court a second-in-time petition for post-conviction relief, a motion for leave to file a delayed motion for a new trial, and a motion for funds to employ an investigator. (Doc. 188-1 at 31-138 (Post-Conviction Petition); Doc. 209-1 at 4-10 (Motion for Funds), 11-115 (New-Trial Motion).) In both the post-conviction petition and delayed motion for new trial, he asserted a single claim of juror bias based on both Mikesell's alleged extra-judicial information about him and her alleged

relationship with the victims' families. (Doc. 188-1 at 38-40; Doc. 209-1 at 14-17.) He also requested discovery. (Doc. 188-1 at 31; Doc. 209-1 at 17.) As support, he submitted the 2003 affidavit of Jackson's investigator, who interviewed the jurors after the trial, with the attached report; the 2008 Freeman and Wobler affidavits; the 2009 depositions of Freeman and Wobler; and the 2009 deposition of Mikesell. (*See* Doc. 188-1 at 42; Doc. 209-1 at 19 (lists of exhibits).) The State responded to Cunningham's post-conviction petition and motions, and moved to dismiss the petition and new-trial motion. (Doc. 188-1 at 150-82.)

In September 2015, the trial court denied the post-conviction petition and motion for leave to file a delayed motion for a new trial without permitting discovery or an evidentiary hearing; denied the motion for funds to employ an investigator; and granted the State's motion to dismiss. (*Id*. at 223-38.) Cunningham appealed the trial court's judgment to the state appellate court. (Doc. 188-2 at 7.) The court of appeals affirmed the ruling in May 2016. (*Id*. at 159-83.) Cunningham appealed that judgment to the Ohio Supreme Court (*Id*. at 187-88), which declined jurisdiction in July 2017 (Doc. 188-3 at 96).

### D. Reinstated Federal Habeas Proceedings

Cunningham returned to this Court in November 2017. (*See* Doc. 187.) He filed an "Amended Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus" in July 2018. (Doc. 200.) Therein, he reasserts the first claim for relief in his original habeas petition, captioned: "The state court determinations that errors in jury selection did not deprive Mr. Cunningham of a fair trial and sentencing proceeding rest on unreasonable determination of

facts, are contrary to, or an unreasonable application of law." (Doc. 200-1 at 6 (capitalization altered).) He expands upon his analysis of his allegations related to juror Mikesell's relationship with the victims' families. (*Id*. at 12-22.) Claims for relief 2 through 14 of Cunningham's amended petition are nearly identical to his original petition.[5]

Respondent filed a "Supplemental Return of Writ to Amended Petition" in October 2018 (Doc. 201), and Cunningham filed a "Traverse" in June 2019. (Doc. 205.) Cunningham also filed a motion for discovery (Doc. 206), which Respondent opposed (Doc. 207).

**ANALYSIS**

**A.      Scope of Remand**

As a preliminary matter, the parties dispute the scope of the Sixth Circuit's remand. Cunningham argues that the circuit court made its mandate "clear" when it stated at the beginning of its opinion: "[W]e vacate the district court's judgment and remand the petition to the district court to determine whether it is appropriate to stay-and-abey the petition while Cunningham returns to state court to exhaust this claim." (Doc. 205 at 3 (quoting *Cunningham*, 756 F.3d at 479).) He asserts that through this language, the court vacated this Court's entire judgment denying his petition, and the Court must now reconsider all of his claims, taking into account the "significant legal developments" in habeas law since the

---

[5] Cunningham added a brief argument to support his second claim for relief, for example. (*See* Doc. 200-1 at 37-41.)

allegedly vacated judgment was issued nearly nine years ago. (*Id*. at 3-4.)

Respondent, for his part, notes the circuit court explained that it was "address[ing] only" Cunningham's claim of juror bias based on Mikesell's alleged relationship with the murder victims' families and her resulting impartiality. The Sixth Circuit specifically determined that the juror-bias claim was not plainly meritless because of evidence of "Mikesell's alleged relationship with the families of the victims..." *Cunningham*, 756 F.3d at 486. In finding the claim was unexhausted but neither procedurally defaulted nor plainly meritless, it remanded the petition to this Court for a stay-and-abeyance determination. (Doc. 201 at 25-30.) He maintains that the "law of the case" doctrine dictates that this Court should review only the juror-bias claim at issue in the Sixth Circuit's opinion and decline to reconsider its prior ruling on Cunningham's other claims. (*Id*.)

The doctrine of law of the case provides that findings made at one point in litigation become the binding law of the case for subsequent stages of that same litigation. *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994) (citing *United States v. Bell*, 988 F.2d 247, 250 (1st Cir. 1993)). A related theory is the mandate rule, which "requires lower courts to adhere to the commands of a superior court." *Id*. (citing *Bell*, 988 F.2d at 251). Therefore,

> "[u]pon remand of a case for further proceedings after a decision by the appellate court, the trial court must 'proceed in accordance with the mandate and the law of the case as established on appeal.' The trial court must 'implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.'"

13

*Id.* (quoting *United States v. Kikumura*, 947 F.2d 72, 76 (3d Cir. 1991) (citations omitted)).

Appellate courts have broad discretion to issue either a general or limited remand. *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999) (citing 28 U.S.C. § 2106). General remands "give district courts authority to address all matters as long as remaining consistent with the remand." *Id.* Limited remands, on the other hand, "explicitly outline the issues to be addressed by the district court and create a narrow framework within which the district court must operate." *Id.* "Traditionally, the mandate rule instructs that the district court is without authority to expand its inquiry beyond the matters forming the basis of the appellate court's remand." *Id.*

The scope of a remand is ascertained by "examining the entire order or opinion, to determine whether and how the court of appeals intended to limit a remand." *Scott v. Churchill*, 377 F.3d 565, 570 (6th Cir. 2004). When confronted with a remanded case, a district court must "determin[e] what part of this court's mandate is intended to define the scope of any subsequent proceedings. The relevant language could appear anywhere in an opinion or order, including a designated paragraph or section, or certain key identifiable language." *Campbell*, 168 F.3d at 266-67 (footnote omitted). Individual paragraphs and sentences, however, must not be read out of context. *Id.* at 267.

Here, the Sixth Circuit's opinion indicates that its remand was limited in scope. The court explicitly stated the limited purpose of the opinion: to order consideration of a stay and abeyance so that Cunningham could exhaust in state court a claim that the circuit court

14

found was neither procedurally defaulted nor plainly meritless. And it clearly identified the action this Court was to take: "[W]e remand Cunningham's mixed habeas petition to the district court to determine whether state-and-abeyance is appropriate." *Cunningham,* 756 F.3d at 487. Consistent with that limited objective, the circuit court vacated this Court's judgment to allow for further consideration of the juror-bias claim.

Pursuant to that limited remand, this Court determined that stay-and-abeyance was appropriate while Cunningham exhausted the juror-bias claim. (Doc. 173.) As those state-court proceedings are complete, this Court will review the now-exhausted claim of juror bias based on Mikesell's alleged relationship with the families of the murder victims. The Court will not revisit Cunningham's other claims, as it "is without authority to expand its inquiry beyond the matters forming the basis of the appellate court's remand." *Campbell*, 168 F.3d at 265. The Court, therefore, repeats and incorporates herein its judgment of December 7, 2010 (Doc. 157), as to Cunningham's remaining claims in his claim for relief 1 and his claims for relief 2 through 14.[6]

---

[6] The Court denies Cunningham's motion for discovery (Doc. 206) because, to the extent he seeks information relating to claims other than his juror-bias claim based on Mikesell's alleged relationship with the victims' families, it too exceeds the scope of the Sixth Circuit's limited remand. And, to the extent he requests information related to the juror-bias claim at issue here, Cunningham cannot satisfy his burden of showing good cause for the discovery. *See* Rule 6(a) of the Rules Governing § 2254 Cases (permitting discovery under the federal civil rules "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise"); *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (noting that a federal habeas petitioner, "unlike the usual civil litigant, is not entitled to discovery as a matter of ordinary course"). This Court already has granted leave for similar discovery concerning this claim – including depositions of Mikesell, all seated and

## B.    Cunningham's Claim of Juror Bias

In his amended petition, Cunningham asserts that during the jury's deliberations, the jury foreperson, Nichole Mikesell, told her fellow jurors that she knew the families of the victims, they were her clients at the Allen County Children's Services, and she pressured the jurors to convict Cunningham and sentence him to death "to spare her the negative reactions from the victims' family members."  (Doc. 200-1 at 12-14.)  Cunningham notes that Mikesell did not divulge this alleged relationship during *voir dire*.  (*Id*. at 8.)  He bases his claim on information gleaned from the affidavits and depositions of two jurors, Staci Freeman and Roberta Wobler, taken in 2008 and 2009.  (*See* Doc. 103-1 (Wobler Aff.); Doc. 104-1 (Freeman Aff.); Doc. 136-1 (Wobler Dep.); Doc. 137-1 (Freeman Dep.).)

### 1.    Procedural Posture

Respondent argues that this claim is procedurally defaulted and barred from federal habeas review.  The default occurred, he asserts, when Cunningham returned to state court to raise it for the first time and the state courts rejected his second-in-time petition for post-conviction relief as untimely and successive under Ohio's statutory post-conviction relief scheme, and his motion for leave to file a delayed motion for a new trial as failing to meet the requirements of Ohio's procedural rules.  (Doc. 201 at 10-17.)

Procedural default occurs when a habeas petitioner fails to obtain consideration of a

---

alternate jurors in Cunningham's trial, Allen County Children's Services employees, and Jackson's investigator (*see* Doc. 86 at 12) – and funds for an investigator (*see* Doc. 92). Additional discovery is unwarranted.

federal constitutional claim by state courts because he or she failed to comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). In determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, the federal court looks to the last state court rendering a reasoned opinion on that claim. *Ylst v. Nunnemaker,* 501 U.S. 797, 805 (1991).[7]

Where a state court declines to address a prisoner's federal claim because the prisoner has failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id.* at 732-33. To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).

---

[7] Where a later state-court decision rests upon a prohibition against *further* state review, the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ." *Ylst*, 501 U.S. at 804 n.3. In that case, habeas courts "look through" that later decision to the prior reasoned state-court judgment. *Id.* at 805 ("state rules against [a] superfluous recourse [of state habeas proceedings] have no bearing upon [a petitioner's] ability to raise the [federal] claim in federal court").

In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit established this now familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction – that is, whether the state courts actually based their decisions on the procedural rule. Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

*State-court decision*. Here, the state appellate court which was the last state court to consider Cunningham's juror-bias claim based on Mikesell's alleged relationship with the victims' families, upheld the trial court's dismissal of Cunningham's post-conviction petition. (Doc. 188-2 at 165-75.) It explained that when Cunningham filed his second-in-time petition in December 2014, Ohio's statutory post-conviction relief scheme required that petitions in capital cases be filed within 180 days after the trial transcript is filed in the Ohio Supreme Court. (*Id*. at 165-66 (citing Ohio Rev. Code § 2953.21(A)(2)).)[8] Otherwise,

---

[8] The court noted that on March 23, 2015, this time period for defendants to file post-conviction petitions was extended from 180 to 365 days. (*Id*. at 166 n.2.)

trial courts "lack[ed] jurisdiction to entertain" untimely or successive petitions, unless the petitioner established that one of two exceptions applied: either (1) he was "unavoidably prevented from discovering the facts necessary for the claim for relief"; or (2) the claim was based on a new and retroactive federal or state right recognized by the United States Supreme Court. (*Id*. at 166-67 (citing Ohio Rev. Code § 2953.23(A)(1)(a)).) A defendant "is 'unavoidably prevented' from the discovery of facts if he had no knowledge of the existence of those facts and could not have, in the exercise of reasonably diligence, learned of their existence" before the filing deadline for post-conviction petitions. (*Id*. at 170) (citations omitted). If the petitioner was able to satisfy one of these threshold conditions, then he was required to demonstrate by clear and convincing evidence that, but for the constitutional error at trial or the sentencing hearing, no reasonable fact-finder would have found him guilty of the offenses or found him eligible for a death sentence. (*Id*. at 167) (citing Ohio Rev. Code § 2953.23(A)(1)(b).)

The court first rejected Cunningham's argument that his petition was not successive, and, therefore, subject to § 2953.23(A), because Ohio's post-conviction process had failed to "provide an adequate corrective process" for review of his constitutional claims. (*Id*. at 167.) It noted that his petition was subject to § 2953.23(A) because it was untimely by more than a decade, and that a court cannot "bypass the requirements of R.C. 2953.23 and consider his petition because Ohio's postconviction process somehow failed him." (*Id*. at 168.)

The state court then determined that Cunningham did not satisfy either exception for untimely and successive petitions under § 2953.23(A)(1)(a). He did not assert that his juror-bias claim was based on a new federal or state right. (*Id*. at 170.) And, contrary to Cunningham's assertion, he was not "unavoidably prevented" from discovering the facts supporting his claim by the ineffectiveness of post-conviction counsel or the inability to conduct discovery; Mikesell, Freeman, and Wobler were "available and interviewed by a privately hired investigator" some time before the date of the investigator's affidavit – July 16, 2003 – and within the specified time for filing his first post-conviction petition. (*Id*. at 169-72.) The court stressed that, in its view, the juror-bias claim Cunningham asserted in his first petition raised the "same arguments" that Cunningham presented in his second petition – namely, "that Mikesell committed 'juror misconduct,' that she was prejudiced against Cunningham, and that her presence on the jury 'may have contaminated the remainder of the jury[.]'" (*Id*. at 172 (citing Doc. 192-4 at 83-86).) The court concluded that, "[o]n that basis alone," the trial court was "without jurisdiction" to entertain Cunningham's petition. (*Id*. at 173.)

Finally, the court explained that even if it were to find that Cunningham had satisfied § 2953.23(A)(1)(a), he had not shown that, but for the alleged constitutional error, no reasonable fact-finder would have found him guilty of the offenses or found him eligible for a death sentence under § 2953.23(A)(1)(b). (*Id*. at 173-75.) It rejected, as unsupported by any authority and contradicted by the plain language of the statute, Cunningham's argument

that he had satisfied § 2953.23(A) because "a biased juror is a structural defect that does not require a showing of harm."  (*Id.*)

The state court then turned to Cunningham's motion for leave to file a delayed motion for a new trial.  Ohio Criminal Procedure Rule 33 provides that "[a] new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights: . . . (2) Misconduct of the jury . . . ."  Ohio R. Crim. P. 33(A).  Rule 33(B) sets a 120-day time limit from the date of the verdict or judgment for new-trial motions based on newly discovered evidence, unless the defendant can demonstrate that he was "unavoidably prevented from discovering the evidence" within that time period.  Ohio R. Crim. P. 33(B).  The state court observed that "'[a] party is 'unavoidably prevented' from filing a motion for a new trial if the party had no knowledge of the existence of the ground supporting the motion and could not have learned of that existence within the time prescribed for filing the motion in the exercise of reasonable diligence.'"  (Doc. 188-2 at 177 (quoting *State v. Lee*, No. 05AP-229, 2005 WL 3220245, *1 (Ohio Ct. App. Dec. 1, 2005)).)    Cunningham asserted that he was unavoidably prevented from discovering the information relating to Mikesell's relationship with the victims' families within the rule's 120-day time limit until he was granted permission to conduct discovery in federal court.  The court rejected this argument.  (*Id.* at 179.)  It again pointed to the investigator's interviews of Mikesell, Freeman, and Wobler sometime prior to the date of his July 16, 2003 affidavit as evidence that Cunningham had notice of Mikesell's misconduct and had the

ability to obtain information about her alleged relationship with the victims' families within the rule's prescribed time period. (*Id*. at 179-80.) "The purported new evidence of juror misconduct was not undiscoverable simply because, as Cunningham argues, he did not discover it sooner," the court observed. (*Id*. at 180.)

*Procedural default.* Respondent argues that in this decision, the state appellate court clearly asserted an independent and adequate state procedural bar to Cunningham's juror-bias claim based on Mikesell's relationship with the victims' families, and the claim is procedurally defaulted. (Doc. 201 at 5.)[9] Cunningham strongly contests the state court's ruling. He does not challenge the default under the second and third prongs of the *Maupin* test for procedural default of federal habeas claims, i.e., requiring that the rules state courts applied to preclude review of the claim were actually applied and were adequate and independent state grounds upon which state courts can rely to refuse to consider the merits of a federal constitutional claim. (*See* Doc. 200-1 at 16.) Rather, he contends the ruling does not satisfy *Maupin*'s first prong, that he failed to comply with a state procedural rule. (*Id*.)

Cunningham asserts that his "diligence overcomes any default based on [§ 2953.23(A)(1)(a)]." (Doc. 205 at 10 (capitalization altered).) He first challenges the state

---

[9] The parties limit their arguments to the state appellate court's review of Cunningham's post-conviction petition and are silent about his new-trial motion. As the state court's analyses regarding both pleadings were virtually identical, the Court will limit its discussion to the post-conviction petition as well.

court's finding that he had notice of the underlying factual basis of the claim during post-conviction proceedings and, therefore, could have discovered the evidence at that time, long before he conducted discovery in his federal habeas proceedings. (Doc. 200-1 at 16.) He claims that the only evidence he obtained while in state court after conviction was of Mikesell's knowledge of information about him from the social services agency at which she worked and "there was no notice or even hint of the evidence found anew in federal court" relating to her relationship with the victims' families. (*Id*.) Mikesell was never questioned about the family members during state-court proceedings, and the state trial court on post-conviction did not permit discovery or conduct an evidentiary hearing. (*Id*.) Cunningham emphasizes that, contrary to the state court's analysis, the claims based on Mikesell's negative information about him and her relationship with the victims' families "are two distinct factual claims." (*Id*.) The Sixth Circuit made this point clear, he argues, when it observed that "'the factual basis [of the exhausted state-court juror-bias claim] was Mikesell's knowledge of Cunningham from her colleagues, not her alleged relationship with the families of the victims.'" (*Id*. (quoting *Cunningham*, 756 F.3d at 482).)

Cunningham cites as support the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 420 (2000). (Doc. 200-1 at 18-19.) In that case, the court held that a habeas petitioner was entitled to an evidentiary hearing on a juror-bias claim under 28 U.S.C. § 2254(e)(2) because he made a reasonable effort to develop the claim in state-court proceedings. *Id*. at 443. The petitioner had discovered evidence during federal habeas

proceedings that, during *voir dire*, the jury foreperson failed to disclose that a state witness was her former husband and the prosecutor had represented her when he was in private practice. *Id*. at 440-43. The court noted that the petitioner had some concerns about a different juror, which the petitioner's state habeas counsel had unsuccessfully requested funding for an investigator to examine, but that the trial record "contain[ed] no evidence which would have put a reasonable attorney on notice" of the jury foreperson's misconduct at issue at that time. *Id*. at 442.

In *Williams*, however, the court was evaluating the petitioner's efforts in state court in the context of a *federal* habeas statute, 28 U.S.C. § 2254(e)(2), which prohibits an evidentiary hearing on a claim "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings" unless the applicant satisfies certain conditions.[10] 28 U.S.C. § 2254(e)(2). The court explained that under § 2254(e)(2), "a failure to develop the factual basis of a claim is not established unless there is lack of diligence or some greater

---

[10] Those conditions are:
(A)   the claim relies on –
    (i)   a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
    (ii)   a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B)   the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.
28 U.S.C. § 2254(e)(2). Section 2254(e)(2) also applies to the introduction of new evidence without an evidentiary hearing, such as when the petitioner seeks to introduce new evidence based on a motion to expand the record. *Holland v. Jackson*, 542 U.S. 649, 653 (2004).

fault attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432. A federal court's finding of diligence in the context of a federal habeas proceeding is not equivalent to a state court's finding of diligence in the context of the state's post-conviction statutes and procedural rules.

Moreover, in this case, unlike *Williams*, Cunningham had notice of Mikesell's potential bias and misconduct during deliberations as early as July 2003, the date of the investigator's report, which Cunningham submitted with his first post-conviction petition, timely filed in August 2003. (Doc. 192-4 at 310-11 (Ex. R to Post-Conviction Petition).) As the state appellate court reasonably opined, once on notice, Cunningham was free to further investigate Mikesell and any bias or misconduct on her part, even if outside the formal discovery process. Information relating to Mikesell's relationship with the victims' families was not undiscoverable until he conducted discovery in these habeas proceedings several years later, in 2008 and 2009, simply because Cunningham did not discover it sooner.

Cunningham argues that the issue of "diligence" is a question of federal law to be determined by federal habeas courts, and this Court has found that he was diligent in attempting to develop his juror-bias claims in state court. (Doc. 205 at 11.) He cites the Tenth Circuit's decision in *Boyle v. McKune*, 544 F.3d 1132 (10th Cir. 2008), to support this proposition. But, again, the court in *Boyle* was evaluating a petitioner's diligence under AEDPA's § 2254(e)(2). *See id.* at 1136. This Court, too, considered Cunningham's

diligence during the course of this action only for purposes of § 2254(e)(2) or other federal procedural issues. (*See* Doc. 155 (Op. on Resp. Motion to Strike Deps.) at 3); Doc. 173 (Op. on Pet. Motion to Stay) at 6.) Those determinations are not relevant to this procedural-default analysis.

In fact, the circuit court noted in *Boyle* that "[t]he state courts are, of course, the final arbiters of when and how a state prisoner can obtain an evidentiary hearing in their courts." *Boyle,* 544 F.3d at 1135-36. This is the controlling principal here. It is well-established, as Respondent argues and the Sixth Circuit made clear in its remand decision, that "the determination of whether a habeas petitioner satisfies a state procedural requirement 'is for the state court to make.'" *Cunningham*, 756 F.3d at 483 (quoting *Wagner v. Smith*, 581 F.3d 410, 419 (6th Cir. 2009)); *see also id.* at 484 ("[W]e conclude that it is for the Ohio courts, not this court, to determine whether Cunningham may bring this petition") (citing *Godbolt v. Russell*, 82 Fed. Appx. 447, 450 (6th Cir. 2003) (holding that even though it was unlikely that petitioner met the requirements for a second post-conviction petition in Ohio, "it is for the state courts to interpret and enforce their laws on such issues")); *Vance v. Scutt*, 573 Fed. Appx. 415, 418-19 (6th Cir. 2014) ("Timeliness is not a simple question of fact that requires nothing more than counting days on a calendar; rather, it is a matter of state procedural law . . . . We do not meddle with state court decisions on state procedural issues in habeas. We are bound by the state court's determination of its own law.") (internal quotation marks and citations omitted). Habeas courts "are bound by state court

interpretations of state criminal law except in extreme circumstances where it appears that the interpretation is an obvious subterfuge to evade consideration of a federal issue." *Warner v. Zent*, 997 F.2d 116, 133 (6th Cir. 1993) (citing *Mullaney v. Wilbur*, 421 U.S. 684, 690–91, n.11 (1975)). There is nothing in the state appellate court's application of Ohio's post-conviction relief statutes or procedural rules that is beyond the norm or contrary to the holdings of the Ohio Supreme Court. This Court is, therefore, bound by, and must defer to, the state court's determination that Cunningham did not meet the diligence requirement of Ohio's post-conviction provision § 2953.23(A)(1)(a).

Furthermore, Respondent correctly points out that regardless of the state court's finding on Cunningham's diligence under § 2953.23(A)(1)(a), the state court also found that Cunningham failed to satisfy § 2953.23(A)(1)(b), which requires that a defendant demonstrate that but for the alleged constitutional error, no reasonable fact-finder would have found him guilty of the offenses or found him eligible for a death sentence. As explained above, the state appellate court rejected Cunningham's argument that he is not obligated to demonstrate prejudice because "a biased juror is a structural defect" as unsupported by any authority and contradicted by the plain language of the statute. (Doc. 188-2 at 173-75.) Cunningham contends this finding under § 2953.23(A)(1)(b) is irrelevant here because the state court remarked that his failure to satisfy § 2953.23(A)(1)(a) stripped the court of its jurisdiction "[o]n that basis alone . . . [and it] need not address the applicability of R.C. 2953.23(A)(1)(b)." (Doc. 205 at 12 (quoting Doc. 188-2 at 173).) But

the state court did in fact proceed to consider whether Cunningham met that provision, and found he had not. Again, this Court is bound by the state court's interpretation of Ohio law.

Cunningham, therefore, has not demonstrated that the state appellate court misapplied state law and procedural rules in finding his post-conviction petition and new-trial motion procedurally barred from review. And, his claim of juror bias based on juror Mikesell's relationship with the families of the victims is procedurally defaulted.

*Cause and prejudice*. Cunningham argues, however, that even if the claim is procedurally defaulted, the default should be excused for cause. (Doc. 200-1 at 17-22.) A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id*. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Cunningham first contends that the default should be excused because Ohio's post-conviction process never afforded him a "full and fair opportunity to litigate his claim," particularly in denying him discovery that would have led to his uncovering the underlying facts of his juror-bias claim. (Doc. 200-1 at 17.) The Sixth Circuit, however, has explicitly

28

rejected this argument.  In response to a petitioner's claim that the "Tennessee post-conviction statute did not provide him a minimally adequate forum in which to discover and air [his defaulted] claims," the court declared that "criticisms of Tennessee's Post Conviction Procedures Act do not address the question of cause and prejudice."  *O'Guinn v. Dutton*, 88 F.3d 1409, 1455 (6th Cir. 1996) (en banc); *see also Haight v. White*, No. 3:02 CV 206, 2017 WL 3584218, at *38 (W.D. Ky. Aug. 18, 2017) (rejecting petitioner's argument that "the denial of a full and fair state post-conviction process . . . [should] establish cause for the procedural default of specified claims").

Indeed, the Sixth Circuit repeatedly has held that complaints about deficiencies and errors in state post-conviction proceedings are outside the scope of federal habeas corpus review.  *See Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007); *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002); *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986).  It has explained that "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody."  *Kirby*, 794 F.2d at 246 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)).  Challenges to post-conviction proceedings "address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration."  *Id.* at 247.  A due process claim related to collateral post-conviction proceedings, therefore, even if resolved in a petitioner's favor, would not "result [in] . . . release or a reduction in . . . time to be served or in any other way affect his detention because we would not be reviewing any matter

29

directly pertaining to his detention." *Id.* Accordingly, this Court will not review Cunningham's allegations regarding deficiencies in Ohio's post-conviction procedures.

Cunningham next relies again on *Williams v. Taylor, supra,* to support his assertion of cause. (Doc. 200-1 at 18-19.) After concluding that the petitioner had diligently sought to discover the facts supporting his juror-bias claims in state habeas proceedings and, therefore, was entitled to an evidentiary hearing in federal court under § 2254(e)(2), the *Williams* court remarked on the procedural posture of the new claims. *Williams*, 529 U.S. at 443-44. It noted that the petitioner could not have returned to state court to exhaust the juror-bias claims with his newly discovered evidence under Virginia law governing post-conviction relief. *Id.* Under those circumstances, it remarked, "[o]ur analysis should suffice to establish cause for any procedural default petitioner may have committed in not presenting these claims to the Virginia courts in the first instance." *Id.* Cunningham contends this comment suggests that

> the finding of diligence presumed something other than neglect (i.e., something external) as the cause for [the] state petitioner's inability to discover the claim. For this reason, the finding of diligence in state court invariably redounds to a finding of cause when the newly developed evidence results in a new claim in federal court.

(Doc. 200-1 at 19.)

Again, *Williams* does not help Cunningham. The court's discussion of the procedural default of the petitioner's juror-bias claims is dicta, and the circumstances under which the court found cause for the default are easily distinguished. The court's finding of

30

diligence, as explained above, arose in the context of AEDPA's § 2254(e)(2), not a state court's ruling on diligence under a state law or procedural rule. Here, unlike in *Williams*, Cunningham was able to return to state court with his newly developed claim, and the state courts found that under Ohio law and court rules, he was not unavoidably prevented from discovering, or reasonably diligent in attempting to discover, the factual basis of his claim sooner. Accordingly, this argument also fails.

Finally, Cunningham asserts that the ineffectiveness of his post-conviction counsel provides cause for the default under the Supreme Court decisions in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013). (Doc. 200-1 at 19-22.) In *Martinez*, the court held that the "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez,* 566 U.S. at 9. In *Trevino*, the court elaborated on and expanded *Martinez*, by holding that *Martinez* would apply in Texas, even though Texas criminal procedure "on its face appears to permit (but does not require) the defendant to raise the claim [of ineffective assistance of trial counsel] on *direct appeal*." *Trevino*, 569 U.S. at 423 (emphasis original).

*Martinez* and *Trevino*, however, do not apply to Cunningham's juror-bias claim. Although the Sixth Circuit recently held that *Martinez* and *Trevino* apply in Ohio in certain circumstances, *White v. Warden, Ross Corr. Inst*., 940 F.3d 270, 275-78 (6th Cir. 2019), those cases apply only to excuse the default of claims of ineffective assistance of trial

counsel. *See Hodges v. Colson*, 711 F.3d 589, 602-03 (6th Cir. 2013) (refusing to extend *Martinez* to allow the ineffectiveness of post-conviction counsel to provide cause for the procedural default of an ineffective assistance of *appellate* counsel claim). Thus, this argument, too, lacks merit.

Accordingly, Cunningham has not demonstrated cause to excuse the procedural default of his juror-bias claim. And, because he has not established cause, the Court need not consider the "prejudice" prong of the procedural-default analysis. *See, e.g., Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). This claim is procedurally defaulted.

### 2. Merits Analysis

Even if the Court were to review Cunningham's claim of juror bias, it would fail. Because this claim was not adjudicated on the merits in state court, this Court will review it *de novo*. 28 U.S.C. § 2254(d); *see also Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011).

The Sixth Amendment protects a defendant's right, "[i]n all criminal prosecutions," to a "trial, by an impartial jury." U.S. CONST. amend. VI. "The constitutional standard of fairness" guarantees the criminally accused "'a fair trial by a panel of impartial, 'indifferent' jurors.'" *Murphy v. Florida,* 421 U.S. 794, 799 (1975) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). An impartial jury is one in which every juror is "capable and willing to decide the case solely on the evidence before [him or her]." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Even one biased juror violates a defendant's right to a impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).

The Constitution, however, "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith,* 455 U.S. at 217. "Qualified jurors need not . . . be totally ignorant of the facts and issues involved." *Murphy,* 421 U.S. at 799-800. The Supreme Court has long recognized that "[a litigant] is entitled to a fair trial but not a perfect one, for there are no perfect trials." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (internal quotation marks and citations omitted). It has explained:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 723. However, "the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Murphy*, 421 U.S. at 800 (quoting *Irvin*, 366 U.S. at 723).

When a juror's impartiality is at issue, the "ultimate question" is "whether the 'juror swore that he could set aside any opinion he might hold and decide the case on the evidence, and [whether] the juror's protestation of impartiality [should be] believed.'" *White v. Mitchell*, 431 F.3d 517, 538 (6th Cir. 2005) (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)). Habeas courts must accord "special deference" to trial courts in determining a juror's credibility, as trial judges are in the best position to assess the demeanor and

33

credibility of the jurors. *Patton*, 467 U.S. at 1038. *Voir dire* examination serves to protect the defendant's right to an impartial jury

> by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on *voir dire* may result in a juror being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges.

*McDonough Power Equip., Inc.*, 464 U.S. at 554.

In cases where a juror is alleged to have intentionally concealed information during *voir dire*, a defendant may obtain a new trial if he or she can show that a juror failed to answer honestly a material question on *voir dire*, and a correct response would have provided a valid basis for a challenge for cause. *McDonough Power Equip., Inc.,* 464 U.S. at 556. Challenges for cause are subject to approval by the court and must be based on a finding of actual or implied bias. *Hughes,* 258 F.3d at 457-58 (quotation marks and citation omitted). *McDonough* applies only in cases where the juror's failure to disclose information was deliberate, not merely a mistake. *See Zerka v. Green*, 49 F.3d 1181, 1185 (6th Cir. 1995); *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003). In cases where a juror's failure to respond to *voir dire* questioning is the result of an honest mistake, the pre-existing rule applies, requiring proof of actual juror bias or, in exceptional circumstances, implied bias. *Zerka*, 49 F.3d at 1186 n.7.

In its remand order, the Sixth Circuit posed "the real question raised by this claim: did Mikesell have a relationship with the families of the victims, and if so, was she improperly biased or influenced by that relationship and her knowledge that she would have

34

to face them and work in the community after the trial was over?" *Cunningham*, 756 F.3d at

486. The circuit court found that "the evidence of Mikesell's alleged relationship with the

families of the victims raises grave concerns about her impartiality . . . ." *Id*. at 486-87.

Yet, Cunningham presents no additional evidence now from which to answer this question

than he did in his final statement of the claim in 2010, despite being granted leave to

conduct discovery in these federal habeas proceedings – including depositions and the use

of an investigator – and a return to state court to further develop and exhaust the claim. (*See*

Doc. 141 ("Second Amended Claim 1, A").) Again, the Court finds that Cunningham has

failed to demonstrate that juror Mikesell was biased because of a relationship with the

victims' families and, therefore, could not "lay aside [her] impression or opinion and render

a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723.

 *Admissibility of evidence*. Initially, the evidence Cunningham presents to support

this claim is likely inadmissible under the no-impeachment rule, which generally forbids

jurors from impeaching their verdict, either by affidavit or live testimony. *See Pena-*

*Rodriguez v. Colorado*, 137 S. Ct. 855, 863 (2017). Cunningham's evidence of Mikesell's

alleged bias due to her relationship with the victims' families is derived from four sources:

the 2008 affidavits and the 2009 deposition testimony of jurors Staci Freeman and Roberta

Wobler.

 In juror Freeman's affidavit, she stated:

> At one point during the jury deliberations, I had problems with the apparent fact
> that all the ballistic evidence pointed to a 9mm automatic pistol and not the

revolver [allegedly belonging to Cunningham]. I expressed my opinion and Nichole Mikesell responded that, You don't understand. I know the families of the people that were shot in the kitchen. The families know me and I am going to have to go back and see them. These families are my clients. I interpreted Mikesell's comments as pressure to vote guilty.

(Doc. 104–1 (Freeman Aff.) at 1-2.) Freeman testified at her deposition that, during the

jury's guilt-phase deliberations, Mikesell

stat[ed] that she dealt with the victims and their families, they knew who she was, and that if she would find him not guilty that she would have to deal with them and that's just something she didn't want to have to deal with because they knew who she was.

(Doc. 137-1 (Freeman Dep.) at 60.) When asked how this remark impacted her

deliberations, Freeman testified that she "felt pressured," and "as the last one holding out,

[she] felt that [she] was up against a wall, and [Mikesell] was very domineering and so I just

. . . You know I regret, I shouldn't have, but I voted guilty." (*Id*. at 11.) Mikesell's

comment, she said, "should never have been made . . . ." (*Id*.) Freeman also acknowledged

that she was merely "paraphrasing" what Mikesell had said because it had been eight years

since the trial and she "didn't have a very good memory." (*Id*. at 21- 23.) And, she testified

that "[n]o one forced her" to convict Cunningham. (*Id*. at 23-24.)

Juror Wobler averred in her affidavit that Mikesell said she "knew of the families of

the victims from Family Services." (Doc. 103-1 (Wobler Aff.) at 1.) Wobler added in her

handwriting the words "of" and "from Family Services" to her typewritten affidavit and

initialed the alterations. (*Id*.) She continued, "One young woman on the jury was adamant

that Jeronique was not guilty. Mikesell told the young woman and the jury that the young

woman did not have to work in the local community." (*Id.*)  Wobler testified at her deposition that, "at the very end of the deliberations [Mikesell] stated she may in the future be working with the families under the Welfare Job and Family Services where she worked," but "not that she had been." (Doc. 136–1 (Wobler Dep.) at 5–6.)  She denied, however, that the jurors discussed the comment or the comment had any impact on her deliberations (*Id.* at 6), or that anyone forced her to recommend the death penalty. (*Id.* at 13).

The state trial court[11] reasonably concluded that this evidence is inadmissible under Ohio's version of the no-impeachment rule, Rule 606(B).[12]  (*See* Doc. 188-2 at 17-18.)  The

---

[11] The state appellate court did not address this evidentiary issue.

[12] In *Doan v. Brigano*, 237 F.3d 722 (6th Cir. 2001), *abrogation on other grounds recognized by Thompson v. Parker*, 867 F.3d 641, 648 (6th Cir. 2017), the Sixth Circuit noted that the federal no-impeachment rule, Federal Evidence Rule 606(b), is similar to Ohio's Rule 606(B), but differs in that the federal rule does not require that the evidence of misconduct come from some outside source independent of the jury, and that some circuits have stated that in federal habeas proceedings, Federal Evidence Rule 1101(e) provides that the federal evidentiary rules should be applied in deciding whether juror testimony is admissible to impeach a jury verdict.  *Id.* at 734 n.8 (listing cases).  Nevertheless, the Sixth Circuit concluded:

> In light of the deference to state proceedings called for by AEDPA, it seems strange indeed that a federal habeas court would apply its own rules of evidence despite a conflicting state rule when it is simply reviewing the state court record in making its determination, rather than holding an evidentiary hearing in federal court. *See Shillcutt v. Gagnon*, 827 F.2d 1155, 1161 (7th Cir. 1987) (Ripple, J., concurring). We decline to apply Fed.R.Evid. 606(b) in this case since the district court did not hold an evidentiary hearing.

*Id. Accord Salazar v. Dretke*, 419 F.3d 384, 399 n. 28 (5th Cir. 2005).  As this Court did not hold an evidentiary hearing on this claim and is now reviewing supporting evidence from the state-court record, the Court follows *Doan* and applies Ohio Evidence Rule 606(B) here.

rule provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.

Ohio R. Evid. 606(B). It permits a juror's testimony regarding "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror," but "only after some outside evidence of that act or event has been presented." *Id*. The Supreme Court has rejected constitutional challenges to the similar federal no-impeachment rule, found in Federal Evidence Rule 606(b), as applied to evidence of juror misconduct or bias. *See Tanner v. United States*, 483 U.S. 107 (1987); *Warger v. Shauers*, 574 U.S. 40 (2014). The rule, it has explained,

> promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict. The rule gives stability and finality to verdicts.

*Pena-Rodriguez*, 137 S. Ct. at 865.

The state trial court found that Cunningham's evidence of juror bias based on Mikesell's alleged relationship with the victims' families "speak[s] directly to the jury's deliberation process" at his trial, which is "the exact type of evidence which Rule 606(B) was designed to prohibit." (Doc. 188-2 at 18.) This Court agrees. The evidence at issue does not include extraneous information or involve outside influences, and it imparts no

information specifically related to the facts of the case. *See Warger*, 574 U.S. at 51

(defining "extraneous" information under Federal Evidence Rule 606(b) as "'[e]xternal'

matters [that] include publicity and information related specifically to the case the jurors are

meant to decide, while 'internal' matters include the general body of experiences that jurors

are understood to bring with them to the jury room"); *Pena-Rodriguez*, 137 S. Ct. at 863

(defining "events extraneous to the deliberative process" as reliance on outside evidence,

such as newspapers, dictionaries, or a personal investigation of the facts).  Cunningham

does not allege, for example, that the family members attempted to contact or influence

Mikesell, or that they told her information about the case.  In fact, he concedes that the

"contact" he alleges – Mikesell's fear of facing the families after the verdict – is just

"prospective."  (Doc. 205 at 18.)  Ultimately, Mikesell's alleged relationship with the

families "may well have informed [her] general views [about the tragedy or difficulty of

their situation], but it did not provide either [her] or the rest of the jury with any specific

knowledge regarding" the allegations against Cunningham, and it, therefore, does not fall

under Rule 606(B)'s exception for extraneous information.  *Warger*, 574 U.S. at 51-52.

And, even if some or all of the information could be considered "extraneous," Cunningham

offers no outside evidence to corroborate it.[13]  Accordingly, Cunningham's evidence is most

---

[13] There is some question as to whether Ohio Evidence Rule 606(B)'s requirement that outside evidence corroborate evidence of juror misconduct to render it admissible, or the *aliunde* rule, is constitutional.  In *Hoffner v. Bradshaw*, 622 F.3d 487, 501 (6th Cir. 2010), the Sixth Circuit observed, "This court has previously held that there is 'no constitutional impediment to enforcing' Ohio's *aliunde* rule . . . ."  *Id.* at 501(quoting *Brown v. Bradshaw*,

likely inadmissible under Ohio's no-impeachment rule.

*Actual bias*.  Regardless, even if this evidence of Mikesell's alleged bias is admissible, it does not establish the central premise of Cunningham's claim:  that Mikesell had a relationship with the families of the victims and was improperly influenced by it.  The evidence does not clearly show that there was even a real relationship between Mikesell and the victims' families.  Freeman recounted that Mikesell told her that "[t]hese families are my clients"; she "knew" them and had "dealt" with them, they knew who she was, and she would see them again.  But, she acknowledged that she was merely "paraphrasing" what Mikesell had said because it had been eight years since the trial and her memory was not "very good."  Wobler, on the other hand, stated only that Mikesell said she "knew *of*" the victims' families and "*may*" work with them in the future.

Moreover, even assuming the victims' families were among Mikesell's clients, as Freeman recalled her saying, there is no evidence that that relationship was a sufficient basis upon which to presume bias.  The Sixth Circuit has observed that "[t]here is no constitutional prohibition against jurors simply knowing the parties involved or having knowledge of the case."  *McQueen v. Scroggy*, 99 F.3d 1302, 1320 (6th Cir. 1996), *overruled on other grounds*, *In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004).  In *Wolfe v. Brigano,* 232 F.3d 499 (6th Cir. 2000), however, it held that two jurors were biased because

---

531 F.3d 433, 438 (6th Cir. 2008)).  But, in *Doan*, *supra*, the circuit court found that the state court's application of the rule, *in that case*, violated the petitioner's constitutional right to confront evidence and witnesses and to an impartial jury.  *Doan,* 237 F.3d at 731-32.

their relationships with the victims' parents were "close and ongoing." *Wolfe,* 232 F.3d at 502. One of the jurors had an "ongoing business relationship" with the victim's parents; the other was "close friends" with them and visited them "quite a bit." *Id.* One juror had "spoken to" the parents, and the other's husband "had spoken with the victim's parents about what they thought had happened when their son was killed, information that he related to her at some length." *Id.* The jurors could not state unequivocally that they could set aside their relationships with the victim's parents and decide the case fairly. *Id.*

The following year, the circuit court distinguished *Wolfe* and found no bias where a juror "had an ongoing professional relationship with the victim's mother as her welfare caseworker." *Miller v. Francis*, 269 F.3d 609, 618 (6th Cir. 2001). The court found "no evidence that the relationship was so 'close' that bias must be presumed." *Id.* It rejected the dissent's position that all relationships between welfare caseworkers and their clients are "close." *Id.* The court noted that welfare caseworkers have dozens, if not hundreds of clients, and the juror's responses during *voir dire* about her relationship with the victim's mother were not "indicative of a friendship or strong personal bond" or "an inability to put their professional relationship aside during the trial." *Id.* The juror also responded without equivocation during *voir dire* that she could face the woman after rendering a not guilty verdict. *Id. See also Porter v. Gramley*, 112 F.3d 1308, 1318 (7th Cir. 1998) (finding the "attenuated connections" between a juror and the victim's mother, who attended the same large church, did "not suffice to prove actual bias").

This case is far closer to *Miller* than to *Wolfe*: Cunningham has presented no evidence of a "close and ongoing" relationship between Mikesell and the victims' families such that bias can be presumed. Merely knowing someone does not establish "a friendship or strong personal bond"; nor does a caseworker-client relationship. And, Cunningham has failed to demonstrate anything more.

Furthermore, Mikesell was very forthcoming during *voir dire* about her employment at Allen County Children Services and her familiarity with prosecutors and attorneys because of it. As Cunningham concedes, Mikesell was never questioned directly about her relationship with the victims' families during *voir dire*. (Doc. 200-1 at 16.) But, she was questioned by the trial court, prosecution, and defense counsel about her work and repeatedly "swore that [she] could set aside any opinion [she] might hold and decide the case on the evidence," with no indication that "her protestation of impartiality [should not be] believed." *Patton*, 467 U.S. at 1036.

Early in *voir dire*, Mikesell, who was Juror No. 21 (*see* Doc. 192-4 at 296 (Mikesell Juror Questionnaire)), volunteered that she knew the prosecutors. The trial court closely examined her about the connection in the following colloquy:

| | |
|---|---|
| The Court: | 21. Who do you know? |
| Prospective Juror: | I've worked with several of the prosecutors with regards to my job. |
| The Court: | And what is your job? |
| Prospective Juror: | I work at Allen County Children's Services. I'm an |

42

|                     |                                                                                                                                                                                                                                                                                                   |
|---------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                     | investigator there.                                                                                                                                                                                                                                                                                |
| The Court:          | Okay. And would that have any bearing on your ability to be fair and impartial?                                                                                                                                                                                                                     |
| Prospective Juror:  | No.                                                                                                                                                                                                                                                                                                |
| The Court:          | **Could you decide the case – this case from the facts that are presented from this witness stand and could you look everybody in the eye after the case is over and say, hey, I decided the case from what was presented at court. It had nothing to do with whether I knew you, personalities or anything?** |
|                     | **Okay.**                                                                                                                                                                                                                                                                                          |

(Doc. 194-1 at 488-89 (emphasis added).)

A prosecutor, David Bowers, interrogated Mikesell when she volunteered that she knew defense attorney Robert Grzybowski in this exchange:

| Mr. Bowers:         | . . . Mr. Grzybowski, do any of you know him?      |
|---------------------|----------------------------------------------------|
| Prospective Juror:  | Absolutely.                                        |
| Mr. Bowers:         | You ever been a witness on the witness stand?      |
| Prospective Juror:  | I've been a witness on the witness stand.          |
| Mr. Bowers:         | Has he ever cross-examined you?                    |
| Prospective Juror:  | Absolutely.                                        |
| Mr. Bowers:         | Okay. You – you're Juror No.                       |
| Prospective Juror:  | 21.                                                |
| Mr. Bowers:         | 21.                                                |

43

|  |  |
|---|---|
|  | And you know everyone I guess working – Do you work at Juvenile Court or Ch– |
| Prospective Juror: | Children's Services. |
| Mr. Bowers: | Children's Services. |
|  | **The fact that you work there, you know a lot of the officers, you know a lot of the prosecutors, you know a lot of defense counsel, you know everyone so to speak. Any bearing whatsoever?** |
| Prospective Juror: | **No.** |
| Mr. Bowers: | Okay. |

(*Id*. at 517-18 (emphasis added).)

And defense counsel engaged in this dialogue with her:

|  |  |
|---|---|
| Mr. Grzybowski: | Good afternoon, Juror 21, how are you? |
| Prospective Juror: | Fine. |
| Mr. Grzybowski: | We've met previously? |
| Prospective Juror: | Yes. |
| Mr. Grzybowski: | **The fact that you and I have seen each other in a professional basis for five (5) or so years does that, in any way, taint you from being a fair and impartial juror?** |
| Prospective Juror: | **No.** |
| Mr. Grzybowski: | Okay, why won't that taint you in any way? |
| Prospective Juror: | **Because I'm here to look at the facts of the case**. |
| Mr. Grzybowski: | Okay. |

| | |
|---|---|
| Prospective Juror: | **Regardless if I know you or anyone else doesn't mean anything.** |
| Mr. Grzybowski: | Because we have had the opportunity to interact as well as I know members of the prosecutor's office you've worked with them also, correct? |
| Prospective Juror: | Correct. |
| Mr. Grzybowski: | Do you believe that you'll be able to look at the facts of this case and decide this case based on those facts? |
| Prospective Juror: | Absolutely. |
| Mr. Grzybowski: | Okay.  Now, I do know that you work for Children's Services? |
| Prospective Juror: | Yes. |
| Mr. Grzybowski: | And that working for Children's Services you work around children? |
| Prospective Juror: | Yes. |
| Mr. Grzybowski: | There was a three year old [*sic*] child involved in this particular case. |
| Prospective Juror: | Yes. |
| Mr. Grzybowski: | She died. |
| Prospective Juror: | Uh-huh (yes). |
| Mr. Grzybowski: | Is that, in any way, going to go ahead and cause you to not be fair and impartial to Mr. Cunningham? |
| Prospective Juror: | No. |
| Mr. Grzybowski: | Any questions? |

Prospective Juror:     No.

(*Id*. at 671-73 (emphasis added).)

It is evident from these exchanges that the trial court conducted a full and fair *voir dire*. Mikesell was cooperative during the process, eagerly volunteering information about herself, and she was carefully examined by the judge, prosecutor, and defense counsel about the people she had met through her social services work. She steadfastly maintained throughout *voir dire* that she could decide the case based on the evidence and not be influenced by anyone she knew as a result of her work. There was no hint of any bias on her part.[14] Neither Cunningham's evidence nor the trial record, therefore, demonstrates that Mikesell was actually biased due to a relationship with the families of the murder victims.

*Intentional concealment*. Furthermore, even assuming that Cunningham has established that Mikesell had a close and ongoing relationship with the victims' families, he has offered no evidence to suggest that Mikesell deliberately concealed that relationship in response to a material question on *voir dire*, and that a correct response would have

_____

[14] Cunningham asserts in a conclusory fashion that the trial court did not conduct a "full, fair, and proper *voir dire*," and had he been "permitted the *voir dire* required . . ., it is possible that Mikesell's lack of impartiality, exposure to extra-judicial information, and inability to be fair would have been discovered and she could have been removed." (Doc. 200-1 at 9.) However, "[t]he adequacy of *voir dire* is not easily the subject of appellate review." *Morgan*, 504 U.S. at 730. The trial court has "great latitude" in conducting *voir dire*, and questions are "constitutionally compelled" only "if the trial court's failure to ask these questions [renders] the defendant's trial fundamentally unfair." *Williams v. Bagley*, 380 F.3d 932, 944 (6th Cir. 2004) (internal quotation marks and citations omitted). Cunningham has provided no legal or factual analysis demonstrating how the trial court conducted a fundamentally unfair *voir dire*, and this assertion is meritless.

provided a valid basis for a challenge for cause, entitling him to relief under *McDonough*. *McDonough Power Equip., Inc.,* 464 U.S. at 556. Cunningham claims Mikesell withheld "extrajudical information" by responding "No" to a question the prosecutor asked toward the end of *voir dire*: "Anything that you feel you need to bring to our attention that you haven't already?" (Doc. 200-1 at 9 (quoting Doc. 194-1 at 567).) But, it is unclear that the prosecutor asked Mikesell this question and not another juror, and even if he did, such a general, catchall question would not provide the basis for deliberate concealment. Cunningham, therefore, also has not established intentional concealment under *McDonough*.

*Harmless error*. Finally, habeas courts review constitutional errors at trial such as Sixth Amendment violations under the harmless error standard established in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *See Smith,* 455 U.S. at 215, 220; *Mason v. Mitchell*, 320 F.3d 604, 638 (6th Cir. 2003); *Doan*, 237 F.3d at 736. Here, Cunningham would have to show that Mikesell's presence on the jury "'had substantial and injurious effect or influence in determining the jury's verdict[.]'" *Doan*, 237 F.3d at 736 (quoting *Brecht*, 507 U.S. at 637). Even assuming Cunningham could establish that Mikesell's presence on the jury amounted to constitutional error due to her relationship with the victims' families and resulting bias, Cunningham has not shown beyond conclusory assertions that she substantially affected or influenced the jury's verdict or sentence. In fact, Freeman testified that "[n]o one forced her" to convict Cunningham. (Doc. 137-1 at 23-24.) And, Wobler denied that Mikesell's comment about knowing the victims' families had any

impact on her deliberations (Doc. 136-1 at 6), or that anyone forced her to recommend the death penalty (*id*. at 13).

Accordingly, Cunningham's claim of juror bias based on juror Mikesell's alleged relationship with the families of the victims of Cunningham's crimes is meritless.

## CONCLUSION

For the foregoing reasons, this Court denies Cunningham's Amended Petition for Writ of Habeas Corpus (Doc. 200) and Second Motion to Compel Discovery (Doc. 206). The Court further certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could be taken in good faith as to Cunningham's juror-bias claim based on juror Mikesell's relationship with the families of the murder victims, as a reasonable jurist could debate the Court's conclusions regarding that claim, and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to that claim.

IT IS SO ORDERED.

 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
Chief Judge
Dated: 12/18/19                    United States District Court